FINDLEY v DAIMLERCHRYSLER CORPORATION

Docket No. 291402. Submitted June 1, 2010, at Detroit. Decided August 24, 2010, at 9:05 a.m.

Torme C. Findley sought workers' compensation benefits for injuries allegedly sustained when she fell from a motorized cart driven by her supervisor and, on a later date, when she tripped over a cord and fell. The magistrate found that Findley's testimony was not credible and denied benefits. Findley appealed to the Workers' Compensation Appellate Commission (WCAC). The lead opinion, signed by one commissioner, quoted the magistrate's findings of fact, stated that there was no reason to alter those findings, and affirmed the magistrate's denial of benefits. A second commissioner stated that he concurred only with the result reached in the lead opinion without further explanation. The third commissioner dissented, contending that a remand was necessary to resolve a factual issue raised by Findley. Findley sought leave to appeal, which the Court of Appeals granted.

The Court of Appeals *held*:

Under MCL 418.247(8), in order for a decision of the WCAC to be reviewable by the Court of Appeals, it must be a true majority decision. A true majority decision is one in which a majority of the commissioners agree regarding the material facts and the ultimate outcome. There was no true majority decision in this case because a majority of the commissioners did not agree regarding the material facts. A concurrence in the result only does not shed light on the factual findings and legal reasoning used by the WCAC. The matter must be remanded for the WCAC to make adequate findings of fact.

Vacated and remanded.

WORKERS' COMPENSATION — APPELLATE COMMISSION — DECISIONS — REVIEW — MAJORITY OF WORKERS' COMPENSATION COMMISSIONERS — NECESSITY.

For a decision of the Workers' Compensation Appellate Commission to be reviewable by the Court of Appeals, it must be a true majority decision; a true majority decision is one in which a majority of the commissioners are in agreement regarding the material facts and the ultimate outcome (MCL 418.274[8]).

*Slusky & Walt, P.C.* (by *Howard J. Slusky*), and *Daryl C. Royal* for Torme C. Findley.

*Lacey & Jones LLP* (by *Gerald M. Marcinkoski*) for DaimlerChrysler Corporation.

Before: K. F. KELLY, P.J., and WILDER and GLEICHER, JJ.

PER CURIAM. Plaintiff appeals by leave granted an order of the Workers' Compensation Appellate Commission (WCAC), which affirmed the magistrate's denial of benefits.[1] We vacate and remand.

I. BASIC FACTS AND PROCEEDINGS

Plaintiff began her employment as an assembly-line worker for defendant in 1999. On February 18, 2004, plaintiff fell from a motorized cart driven by her supervisor. She stated that she "flew up," hit her head, and lost consciousness. Plaintiff claims that her injuries include shoulder and back pain, a closed-head injury, memory problems, depression, and anxiety.

Plaintiff was off of work for two months. She returned to work in April 2004 and worked through October 2004, but testified that she was unable to do her assigned jobs. Thereafter, plaintiff did not work until August 2005 because no work was available. When plaintiff returned to work, she tripped over a cord and fell. She did not return to work. Defendant sent her a letter regarding her absence from work, but plaintiff did not respond. Plaintiff maintained that she did not receive the letter. Defendant terminated plaintiff's employment in September 2005 because of plaintiff's failure to respond to the letter or return to work.

---

[1] *Findley v DaimlerChrysler Corp*, unpublished order of the Court of Appeals, entered July 1, 2009 (Docket No. 291402).

Plaintiff sought workers' compensation benefits. She alleged work injuries that occurred on February 18, 2004, October 15, 2004, and August 30, 2005. Magistrate Beatrice Logan presided over the November 2007 trial, at which plaintiff and her daughter testified. The magistrate also considered plaintiff's medical records, as well as the deposition testimony of both parties' medical witnesses, in a detailed and thorough written opinion. The magistrate ruled, in pertinent part:

Plaintiff testified that on February 18, 2004, while she was riding on the back of a cart being driven recklessly inside the plant by her supervisor, she was thrown from the cart when he made a turn. The fall caused and/or aggravated injuries to her entire spine, bilateral shoulders, bilateral upper extremities, and bilateral lower extremities. She also sustained a closed head injury and developed problems with anxiety, panic attacks and depression. Plaintiff said she "flew up, hit the concrete, passed out. The next thing I remember I was in the hospital." It is undisputed that plaintiff was riding on an electric cart being driven by a supervisor. Plaintiff weighs 180 pounds, 200 pounds or 240 pounds depending on the various records.

I do not find it credible that a plaintiff at 180 pounds was thrown from a cart and flew through the air. According to the records from St. John Macomb Hospital, the hospital plaintiff was taken after the incident, plaintiff fell out of the cart after the driver made a sharp turn. The records also state the cart tipped over and plaintiff fell off. I reject plaintiff's claim that she was thrown into the air in favor of the conclusion that she merely fell off the back of the cart to the ground.

There were different statements regarding the loss of consciousness by plaintiff. She testified that after hitting her head, the next thing she remembers is being in St. John Hospital. The St. John records state she said she may have briefly loss [sic] consciousness when she hit the ground. She said when she came to she recalls being surrounded by a number of people at the plant. Plaintiff told Dr. Robert

Bauer at Henry Ford Health System that she lost consciousness for an unknown period of time, but awoke on the plant floor in a supine position. Plaintiff told Dr. Sarala Vunnam that she had a loss of consciousness for a few minutes when she fell on carpet. Plaintiff told Dr. Rhonda Levy-Larson that she was thrown from a fast moving cart onto concrete. She said she did not actually remember landing and hitting her head. She woke up in the hospital. She later said she remembered hitting her head and "rolling". She said she lost consciousness for an unknown amount of time and woke up in the hospital. Plaintiff told Dr. Van Horn that she does not remember if she lost consciousness. I do not find plaintiff's testimony credible regarding a loss of consciousness as a result of her fall from the electric cart. Based upon the contradictions as to whether plaintiff actually lost consciousness, I find that she did not lose consciousness.

Plaintiff began treating at Henry Ford Behavior Health System (HFBHS) on March 3, 2004. Plaintiff's initial diagnosis, based upon the history she provided, was adjustment disorder with depressed mood. The records state there were no attention problems noted; no concentration problems noted and plaintiff denied any memory problems. However, it appears that the longer plaintiff treated the more symptoms she developed. Plaintiff returned to work in April, 2004 and worked until October, 2004, with the exceptions of some short lay-offs. She went off work again and returned in August, 2005. By August 6, 2004, her diagnosis was major depressive disorder. Interestingly enough, the records state, on July 20, 2004, plaintiff had returned to work with restrictions and the records state "Plaintiff refused repeated attempts to try to get her to look at ways to channel anger. She keeps self in a 'victim' role."

The HFBHS records for plaintiff on September 6, 2004, state there were no attention problems noted or concentration problems and plaintiff's thought process was logical/coherent.

The HFBHS records entry for October 15, 2004, states plaintiff complained her co-workers are out to get her because she accidentally almost hit one of her co-workers with her car. She said the co-worker became upset and tried

to cut her off in her car. She said the co-worker was told by a supervisor to run her off the road. Plaintiff also mentioned that prior to the incident of February 18, 2004, there was some jealousy of her skills as a laborer. Plaintiff felt people were making threats and talking about her.

On November 23, 2004, the HFBHS records state plaintiff was driving and paying bills.

Plaintiff testified she had hallucinations, that she hears voices, and see[s] shadows, but Dr. Nanette Colling noted on January 14, 2005 that plaintiff had no auditory or visual perceptual disturbances.

Dr. John Head, Jr. treated plaintiff from July 6, 2006 to September 27, 2007, at the Northeast Guidance Center (NGC). Dr. Head's diagnosis was major depression with psychotic features. Dr. Samet's diagnosis was signs and symptoms suggestive of possible brain injury with Major Depression. Dr. Van Horn's diagnosis was Adjustment Disorder mixed with Anxiety and Depression. Dr. Head, Dr. Samet and Dr. Van Horn found plaintiff disabled as a result of the injuries she sustained on February 18, 2004. All three doctors relied on the history of events as described by plaintiff.

Dr. Rhonda Levy-Larson evaluated plaintiff on September 25, 2006. Dr. Levy-Larson testified plaintiff could not sign her name without looking at her driver's license[]. Yet plaintiff was seen at the NGC on September 12, 2006. The records state plaintiff was pleasant and cooperative. She told Dr. Head she had been down without her meds and was not sleeping well without her meds. On October 10, 2006, plaintiff was at NGC and told Dr. Head that she felt a little better and her appetite was still poor at times. Dr. Head noted she appeared depressed. There is nothing to indicate plaintiff was so mentally disabled that she did not know who she was and would have to refer to her driver's license to write her name.

Dr. Michael Freedman evaluated plaintiff on January 5, 2007. Dr. Freedman testified plaintiff appeared for the evaluation and could not recall where she lived, her age, her date of birth, but she could recall the incident which caused her lack of memory.

Dr. Yasmeen Ahmad evaluated plaintiff on September 21, 2006. When plaintiff arrived for the evaluation with Dr. Ahmad, she had the history of the incident written on a piece of paper along with her birth date, address, telephone number, her sister's name, and other information. However, Dr. Ahmad said plaintiff was oriented to month, day, season, place and person.

Dr. Jeffrey E. Middeldorf evaluated plaintiff on October 11, 2005. At Dr. Middeldorf's evaluation, plaintiff was able to provide the doctor a verbal history of the incident and treatment she had received. However, she was unable to move her back, right shoulder and neck. Dr. Middeldorf's findings included gross symptom magnification.

Dr. Samet evaluated plaintiff on November 6, 2006. On the date of Dr. Samet's evaluation, plaintiff did not know the current President Bush or President Clinton, did not know the holiday coming up was Thanksgiving and did not know the function of an ink pen. Plaintiff could not add four plus four, or five plus five. Dr. Samet said plaintiff's ability to cooperate with the evaluation was very limited and her presentation suggested an organic psychosis. On November 7, 2006, the very next day, plaintiff treated at the [NGC]. The NGC's records for November 7, 2006, state plaintiff was pleasant and cooperative. Plaintiff was given medication samples with instructions. The NGC Consumer Progress Note states:

"Ms. Findley's Plan of Service Review was done today by writer/therapist with input from Ms. Findley. She wished to retain current goals/objectives but stated that she hasn't gone to a county clinic due to waiting period and comfortability as Medicare insurance will not be effective until 2007. Therapist has encouraged her many times to see her previous primary care doctor who is familiar with her physical condition as she states that she has chronic pain particularity [sic] in legs, back, neck, and hand area due to a car accident and injury on her job. Discussed level of care and transitioning to groups next year in addition to consultation again with a case manager due to inability to get some prescriptions filled and not having medical insurance. Ms. Findley was satisfied with the services received

during this review period ands [sic] states that she wants to feel normal again physically as well as emotionally. She needs to continue to work toward progression of treatment goals/objectives."

On November 7, 2006, there was no indication plaintiff was in such an emotional state that she did not know of President Bush or the day, month or year and would not know the function of an ink pen. At the NGC plaintiff was noted as being pleasant and cooperative and had input in her service review.

Dr. Van Horn testified she was unable to do the complete neuropsychological testing on January 24, 2007 and February 14, 2007, as plaintiff was unable to cooperate with them. However, plaintiff was at NGC on January 9, 2007 and February 6, 2007, and on both visits, she was listed as "pleasant and cooperative". Plaintiff's behavior at NGC was inconsistent with that she exhibited at Dr. Van Horn's attempted evaluations in January and February.

Plaintiff alleges she has problems with her memory despite being able to provide a very detailed history of her incident at work and her subsequent treatment. Dr. Head testified plaintiff had problems with short term memory and not her long term memory. Yet, plaintiff appeared at the evaluation of Dr. Ahmad with her history, birth date, address, telephone number, sister's name, mother's name and the accident date and history written on a piece of paper. It would appear that all of that information would be in her long term memory. None of that information would change to be short term. The history of the incident would be in her long term memory and it was for the other evaluators. Plaintiff's birth date most certainly did not change and would be long term memory as would her address which could be considered short term memory information only if she moved frequently and her address was the same as when she was working. Her sister's name, her mother's name and the accident date would all have been the same and would be in her long term memory if I accept Dr. Head's explanation as to why she could remember some things and not remember others.

Plaintiff was seen by Dr. Shlomo Mandel at Henry Ford Hospital on October 26, 2005. Plaintiff, despite her claim of difficulty with her memory, was able to tell Dr. Mandel that on February 18, 2004, she "was thrown on to a concrete from a fast moving cart" and she tripped over a cord in 2005 and fell to the ground. Plaintiff appears to have no problem with her memory regarding the incident but she has problems with her date of birth and other general information. At trial, she had no problem with providing information but at the [independent medical examinations (IMEs)] she could not remember the same information she easily provided at trial. Dr. Colling at NGC noted on January 14, 2005, that plaintiff complained of memory problems but she was able to remember her appointment. Appointments would be in plaintiff's short term memory and not her long term memory bank. I do not accept Dr. Head's explanation rather I accept the testimony of Dr. Ahmad that plaintiff may have had a mild concussion which did not cause cognitive deficits.

Despite testifying she has problems with her memory, plaintiff said she did not receive the letter from the defendant requiring her to report to work. She said she remembers being told that she would receive a certified letter but she did not receive the letter. She was emphatic that she did not receive the letter.

Because I find plaintiff's testimony not credible, I find she did receive the letter but at her own peril chose to ignore the letter. [MCL] 418.301(5) states:

"(a) If an employee receives a bona fide offer of reasonable employment from the previous employer, another employer, or through the Michigan employment security commission and the employee refuses that employment without good and reasonable cause, the employee shall be considered to have voluntarily removed himself or herself from the work force and is no longer entitled to any wage loss benefits under this act during the period of such refusal."

Plaintiff testified that had she received the letter she would not have been able to work. Plaintiff's explanation is

not sufficient. Case law requires she first report to the defendant and a determination has to be made if the offer is for reasonable employment. I find plaintiff voluntarily removed herself from the workforce when she failed to respond to the defendant['s] offer of employment. However, assuming arguendo I found she did not receive the letter, I would nevertheless find plaintiff not disabled because of the many inconsistencies in her testimony and her exaggerated behavior at the IME's.

Plaintiff complained of pain in her back which radiated into her legs. She had pain in her shoulders which radiated into her hands. She said standing, sitting and walking were all painful. She said her arms would throb and ache with pain all the time. Despite her complaints of constant pain, she did not attend pain management although Dr. Colling recommended several times that she consider pain management. I do not doubt plaintiff experiences pain however, it is not as limiting as she described at trial.

Dr. Head, Dr. Van Horn and Dr. Samet found plaintiff's disability was caused by the incident of February 18, 2004, based upon the history provided by plaintiff. Dr. Ahmad disagreed plaintiff was disabled. Dr. Ahmad said a person cannot have a closed head injury without a loss of consciousness and it was clinically significant that the [electroencephalogram (EEG)] and the CAT scan of plaintiff's brain were normal and plaintiff had not been started on seizure medications by a neurologist. Dr. Head would only testify that he had heard of cases where a person can have a traumatic brain injury with a normal EEG, a normal MRI, and a normal CAT scan. When Dr. Head was asked if it was the exception rather than the rule, he answered he was unsure of the ratio. There was no objective evidence that plaintiff sustained a closed head injury. The doctors that found plaintiff disabled relied on the history as provided by plaintiff and plaintiff's responses at the IME's was grossly exaggerated, even at the IME's requested by her attorney.

Plaintiff testified she has limited use of her right upper extremity, yet she appeared at trial pushing a walker with both hands and appeared to have no difficulty using her

right upper extremity. She also sat and testified with no apparent difficulty. It is not expected that the plaintiff has to sit and squirm to establish she is disabled, but she was apparently able to sit during the time she was on the witness stand without any difficulty until the defense attorney questioned her behavior on the stand as being inconsistent with her testimony that she was unable to sit for long period of time. Her response was she did not know that she could stand while testifying.

I did not find plaintiff credible and her exaggerated responses and behavior at the IME's further lessened her credibility. I therefore, accept the testimony of Dr. Ahmad, Dr. Levy-Larson, Dr. Middeldorf and Dr. Freedman that plaintiff was not disabled based upon the incident of February 18, 2004. If I had found plaintiff sustained a work related injury, I would have had a hard time finding her physically or mentally disabled based upon the lack of objective medical evidence.

Plaintiff apparently has some type of disability but she has failed to sustain her burden of proof that the disability was either caused or significantly aggravated by her employment with the defendant.

Benefits are denied. [Citations omitted.]

Plaintiff appealed to the WCAC. Plaintiff also filed a "MOTION FOR ADDITIONAL TESTIMONY," contending that the magistrate incorrectly stated that she had used a walker at trial. Plaintiff sought to have the WCAC either accept her affidavits to that effect or remand the matter to the magistrate for further findings. Two WCAC commissioners denied plaintiff's motion without explanation. The third commissioner dissented, opining that a remand was warranted because the magistrate's reference to the walker was not harmless given that the case hinged on plaintiff's credibility.

On March 12, 2009, the WCAC affirmed the magistrate's denial of benefits. In the lead opinion, one commissioner stated:

> We find no reason to alter the magistrate's findings. The magistrate performed the necessary fact finding functions with detail and clarity. The magistrate provided numerous reasons to support her conclusion that she could not trust plaintiff's testimony. She then explained that she also could not accept plaintiff's experts' opinions because the experts relied on plaintiff's exaggerated statements to form their opinions. Plaintiff argues that we should substitute our findings. We cannot, because to do so would clearly violate the *Isaac* [*v Masco Corp*, 2004 Mich ACO 81,] standard. Plaintiff provides nothing more than an alternative view of the facts.

A second commissioner concurred "in result only," without explanation. The third commissioner again dissented. He was concerned that the magistrate's assessment of plaintiff's credibility might have been influenced by an inaccurate recall of plaintiff's use of a walker at trial. He opined that a remand was necessary to resolve any such inaccuracy before the WCAC could properly render an ultimate decision.

## II. STANDARD OF REVIEW

Review under the Worker's Disability Compensation Act (WDCA), MCL 418.101 *et seq.*, is limited. *Rakestraw v Gen Dynamics Land Sys, Inc*, 469 Mich 220, 224; 666 NW2d 199 (2003). When substantial evidence on the whole record does not exist to support the magistrate's factual findings, the WCAC may substitute its own findings of fact for those of the magistrate. *Mudel v Great Atlantic & Pacific Tea Co*, 462 Mich 691, 698-700; 614 NW2d 607 (2000). In contrast, in the absence of fraud, this Court must treat findings of fact made by the WCAC when acting within its powers as conclusive if there is any competent supporting evidence in the record. MCL 418.861a(14).

This Court does not independently review whether the magistrate's findings of fact are supported by sub-

stantial evidence. *Mudel*, 462 Mich at 700-701. Rather, this Court's review is complete once it is satisfied that the WCAC has understood and properly applied its own standard of review. *Id.* at 703-704. As long as the WCAC did not " 'misapprehend or grossly misapply' " the standard of substantial evidence and the record reflects evidence supporting the WCAC's decision, then this Court must treat the WCAC's factual decisions as conclusive. *Id.* (citation omitted).

### III. TRUE MAJORITY

Plaintiff argues that the WCAC's decision should be vacated because it did not reflect a true majority of the WCAC panel. We agree.

In order for a decision of the WCAC to be final and reviewable by this Court, it must be a true majority decision. MCL 418.274(8) provides in pertinent part that "[t]he decision reached by a majority of the assigned 3 members of a panel shall be the final decision of the commission." In *Aquilina v Gen Motors Corp*, 403 Mich 206; 267 NW2d 923 (1978), our Supreme Court vacated an order of the Workers' Compensation Appeal Board (WCAB)[2] because it did not reflect a true majority. Two of the board members concurred in the "controlling opinion," but did not issue separate opinions. *Id.* at 209. A fourth board member dissented, and the fifth member concurred in that dissent. *Id.* The Court noted that because two of the board members merely concurred in the result, the controlling opinion was not a "majority *decision*" setting forth the board's findings of fact as required by the WDCA. *Id.* at 212. The Court further emphasized that the board had to properly

---

[2] When *Aquilina* was decided by the WCAB, the predecessor of the WCAC, panels of the WCAB had five members.

articulate its factual findings to facilitate appellate review. *Id.* at 213. The Court ruled:

> [W]e cannot discharge our reviewing responsibilities unless a *true* majority reaches a decision based on stated facts. A decision is not properly reviewable when some of the majority concur only in the result and do not state the facts upon which that result is based. We must ask the board members to make a finding regarding all critical or crucial facts as well as the result when they choose not to sign the controlling opinion.
>
> We would also encourage concurring board members to articulate whether or not they agree with the legal standard and the rationale employed in reaching the decision. While we are mindful that this process of articulation may prove burdensome at times, it will most certainly assist the appellate courts of this state in effectively discharging their responsibilities in these matters. [*Id.* at 214.]

Stated more succinctly, a true majority decision is one in which at least a majority of the commissioners agree regarding the material facts and the ultimate outcome.

Defendant, however, posits that this requirement for a true majority as set forth in *Aquilina* is no longer valid because the standard of review for the WCAC differs from that in effect for the WCAB when *Aquilina* was decided. This argument is unavailing. As our Supreme Court noted in *Mudel*, 462 Mich at 698-699, the WCAB previously employed de novo review of a magistrate's decision. Now, the substantial evidence standard governs the WCAC's review of a magistrate's findings. *Id.* Under this standard, the WCAC engages in a qualitative and quantitative analysis of the whole record and "need not necessarily defer to all the magistrate's findings of fact." *Id.* at 702-703. Importantly, however, our review of the WCAC's findings remains the same as our previous review of the WCAB's findings—we must determine if any competent evidence exists to support

the WCAC's findings. *Id.* at 700-703. Thus, the mere fact that the WCAC's standard for reviewing a magistrate's decision has changed since *Aquilina* was decided is simply not relevant to whether competent evidence supports the WCAC's findings. And, in determining whether any competent evidence exists to support the WCAC's findings, "we cannot discharge our reviewing responsibilities unless a *true* majority reaches a decision based on stated facts." *Aquilina,* 403 Mich at 214. To allow otherwise would be to corrupt the integrity of the administrative process. See *Mudel,* 462 Mich at 701. Accordingly, the true-majority requirement articulated in *Aquilina* continues to be valid.

In this case, one commissioner issued the lead opinion. The second commissioner did not adopt the factual findings of the lead opinion, did not make findings of his own, and instead concurred in the result only. The third commissioner dissented. Therefore, no true majority decision existed because a majority of commissioners did not agree regarding the critical facts of the matter. A concurrence in result only is inadequate for appellate review, as it does not shed light on the factual findings and legal reasoning used by the majority in reaching its ultimate conclusion. Thus, the decision was not a final decision and is not properly reviewable under *Aquilina.* Consequently, the matter requires remand.[3]

---

[3] Defendant's reliance on *Smith v Exemplar Mfg Co,* unpublished opinion per curiam of the Court of Appeals, issued January 31, 2008 (Docket No. 272749), is also unavailing. First, unpublished opinions are not binding on this Court. *Schaendorf v Consumers Energy Co,* 275 Mich App 507, 515; 739 NW2d 402 (2007). Further, *Smith* is obviously distinguishable from the present situation. In *Smith,* this Court ruled that it was apparent from the concurrence that, in all other respects, the concurring WCAC commissioner agreed with the lead opinion and, as such, "there clearly was a two-member majority." *Smith,* unpub op at 2. Because the concurrence in this case was in the *result* only, this Court cannot conclude, as the *Smith* Court did, that the concurring WCAC

On remand, we direct the WCAC to make adequate findings of fact to facilitate the appellate review process. This Court has previously ruled that the WCAC must state the facts it adopted, not merely summarize the magistrate's findings, and must also explain its legal reasoning:

> In order for this Court to discharge its appellate function, the WCAB must sufficiently detail its findings of fact so that the Court can separate the facts it found from the law it applied. . . . In *Kostamo* [*v Marquette Iron Mining Co*, 405 Mich 105, 136; 274 NW2d 411 (1979)], our Supreme Court noted:
>
> "[C]onclusory findings [by the WCAB] are inadequate because we need to know the path it has taken through the conflicting evidence, the testimony it has adopted, the standards followed and the reasoning used to reach its conclusion."
>
> Having reviewed the WCAB's opinion in this case, we find that we cannot perform our appellate function. The WCAB merely affirmed the referee's decision and summarized the expert testimony presented. It did not state which testimony it *adopted*, the standards it followed, or the reasoning it used to reach its conclusion. *Id.* Hence, we vacate the WCAB's opinion and remand this case to the WCAB for further proceedings. [*Williams v Chrysler Corp*, 159 Mich App 8, 11-12; 406 NW2d 222 (1987).]

See also *Lubic v Joba Constr Co*, 429 Mich 865; 413 NW2d 424 (1987) (relying on *Aquilina* to remand to the WCAB for specific findings of fact); *Jamison v Frito-Lay Inc*, 424 Mich 874; 380 NW2d 42 (1986) (remanding to the WCAB for adequate findings of fact sufficient to permit appellate review).

Finally, plaintiff argues that the WCAC abused its discretion by denying her request to remand the case

---

commissioner agreed with the factual findings and reasoning in the lead opinion.

for additional testimony to correct the magistrate's misstatement regarding her use of a walker. Although we find no abuse of discretion at this juncture, if the WCAC deems it necessary, it may remand the matter to the magistrate. MCL 418.861a(12).

Vacated and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.